AUSA: Nee                    Telephone: (810) 766-5177
AO 91 (Rev. 11/11) Criminal Complaint     Special Agent: Joe Vandenbossche-FBI    Telephone: (810) 239-5775

# UNITED STATES DISTRICT COURT
## for the
### Eastern District of Michigan

| | |
|---|---|
| United States of America<br>v.<br><br>Jaakawa McGruder,<br>a.k.a "Jaawkawa," "Jaak," "Yaak" | Case: 4:22−mj−30533<br>Assigned To : Ivy, Curtis, Jr<br>Assign. Date : 12/19/2022<br>Description: IN RE SEALED MATTER (kcm) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____On or about 3/7/2018-7/27/2019_____ in the county of _____Genesee_____ in the _____Eastern_____ District of _____Michigan_____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1512(k) | Conspiracy to tamper with a witness |

This criminal complaint is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Joseph Vandenbossche, Special Agent - FBI
*Printed name and title*

Sworn to before me and signed in my presence
and/or by reliable electronic means.

Date: ___December 19, 2022___

_____
*Judge's signature*

City and state:  Flint, Michigan                    Curtis Ivy, Jr., United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A CRIMINAL COMPLAINT
## AND ARREST WARRANT

I, Joseph Vandenbossche, a Special Agent with the Federal Bureau of Investigation, being duly sworn, depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed for approximately 22 years. I am currently assigned to the Detroit Division – Flint Resident Agency. I have received training and participated in investigations involving fraud and other crimes during my time as an FBI Agent.

2.     Other law enforcement officers and I are investigating Omar Rashad Pouncy (DOB XX/XX/1987), Jaakawa McGruder, a.k.a. "Jaawkawa," "Jaak," "Yaak" (DOB XX/XX/1984), and others, known and unknown, for violations of 18 U.S.C. § 201(b)(4) (witness bribery), (18 U.S.C. § 1623 (perjury); and 18 U.S.C. § 371 (conspiracy).

3.     This affidavit is submitted for the limited purpose of establishing probable cause that between on or before March 7, 2018, and on or after July 27, 2019, in the Eastern District of Michigan and elsewhere, Pouncy, McGruder, and others, known and unknown, violated the above-referenced statutes. This affidavit

1

does not set forth all of my knowledge about this matter and therefore may not include all the information collected during this investigation. The information contained in this affidavit is based on personal knowledge, on reports made to me by other law enforcement officers, my training and experience, and the combined knowledge, training, and experience of other law enforcement officers and agents with whom I have had discussions.

## SUMMARY

4.     Omar Rashad Pouncy was charged and convicted in state court of multiple carjackings that occurred in 2005. He was sentenced to 562 months to 800 months in state prison. Pouncy filed a habeas corpus petition in federal court to vacate the state judgment. In 2018, the federal court held an evidentiary hearing on the habeas petition. In connection with the hearing, Pouncy conspired with Jaakawa McGruder and others, known and unknown, to have McGruder give false testimony at the hearing in exchange for money. At the hearing, McGruder falsely testified that McGruder, and not Pouncy, was responsible for the carjackings.

## PROBABLE CAUSE

5.     In 2005, Omar Rashad Pouncy, Tiakawa Pierce, and Wayne Grimes, Jr. were charged in connection with three carjackings that occurred in September and October of 2005. Grimes pleaded guilty and testified that he, Pouncy, and Pierce had

carried out the carjackings. Pouncy was found guilty and sentenced to prison by the State of Michigan. Pierce, who was absent during Pouncy's trial, pleaded guilty in February 2008 to accessory after the fact to carjacking. At Pierce's plea hearing on February 14, 2008, Pierce testified under oath that he, Pouncy, and Grimes committed the carjacking that occurred on October 11, 2005.

6.     In November 2013, Pouncy filed a federal habeas corpus petition in the Eastern District of Michigan. Pouncy alleged that he was actually innocent of the carjackings for which he had been convicted, and that another individual, Jaakawa McGruder, had committed the carjackings with Grimes and Pierce. Pouncy submitted to the Court an affidavit signed by McGruder in October 2014, which indicated that McGruder had used an alias and phone number that were implicated in the carjacking cases. Pouncy submitted to the Court a second affidavit signed by McGruder, dated April 18, 2016, in which McGruder stated that he had committed the carjackings with Pierce and Grimes, and that Pouncy did not participate in the carjackings. Pouncy also submitted an affidavit signed by Pierce, dated January 4, 2018, in which Pierce stated that Pierce, McGruder, and Grimes committed the three carjackings, and that Pouncy was not involved.

7.     Pouncy was granted an evidentiary hearing in the Eastern District of Michigan on his actual innocence claims, which took place in federal district court

before U.S. District Judge Matthew F. Leitman on May 22, 2018. During that hearing, Pouncy, who was represented by counsel, called McGruder, then a resident of Arizona, as a witness. McGruder testified under oath that:

    a. McGruder had committed the carjackings for which Pouncy had been convicted, including the carjacking that took place on the evening of October 11, 2005. McGruder committed the carjackings with Grimes and Pierce, and Pouncy was not involved.

    b. McGruder did not have any communication with Pouncy after McGruder signed an affidavit related to Pouncy's case in April 2016.

    c. McGruder was not receiving any money for his testimony, and he had never been offered any payments for his testimony.

8.    Based on the evidence set forth in this affidavit, there is probable cause that the above statements in McGruder's testimony were perjury, that McGruder solicited payment for his perjured testimony, and that Pouncy, McGruder, and others, known and unknown, conspired to obtain the perjury.

9.    I have reviewed jail and arrest records obtained by the State of Michigan from the Westland, Michigan, Police Department and the Genesee County, Michigan, Sheriff's Office. The records show that McGruder was arrested by Westland Police on October 8, 2005, transferred to the custody of the Genesee

County Sheriff's Office on October 11, 2005, and ordered to be held without bond at a hearing on October 12, 2005. Based on this information, McGruder could not have committed the October 11, 2005, carjacking because he was already in custody.

10.    I have also reviewed recorded jail calls made between Pouncy and Person-1 in March 2018, prior to the May 2018 hearing. The calls to Person-1 were placed to the telephone number XXX-XXX-7021. According to records provided by MDOC, this number was registered to Person-1 in conjunction with the MDOC GTL phone call system.

11.    During these calls, Pouncy and Person-1 used coded language to discuss their scheme to provide McGruder with money for his testimony. Based on my training and experience, it is common for individuals discussing illegal activity on recorded jail lines to use coded language to try to prevent authorities from understanding the conversation. Based on information obtained during the investigation, Pouncy and Person-1 referred to McGruder as the "realtor." They similarly referred to the process of obtaining McGruder's participation in the scheme as closing on a house, and they used other real estate terms to refer to other aspects of the scheme.

12.    In a call on March 7, 2018, Pouncy asked Person-1 to contact "*the realtor*" to see if they could "*close on the house*." In a call on March 13, 2018,

Person-1 recommended that Pouncy "*put a down payment on the crib so you don't lose it.*" Pouncy asked Person-1, "*what ole girl daddy want, like, a band right now?*" Person-1 said, "*Yeah, just a band to hold it.*" Based on my training and experience, a "band" is a commonly used term meaning $1,000.

13.     In a call on March 16, 2018, Pouncy asked Person-1, "*did that realtor seem satisfied with that 1000?*" to which Person-1 responded, "*yeah, he did.*" In context, this was a reference to a $1,000 payment that was made to McGruder between March 13, 2018, and March 16, 2018.

14.     I have also reviewed records for payments in March 2018 from Person-1 to McGruder using the Walmart-to-Walmart payment system. Based on my training and experience, the Walmart-to-Walmart payment system allows an individual to send money by making a payment at one Walmart location that another individual can then pick up at another Walmart location. According to these records, Person-1 sent McGruder an additional $1,000 on March 18, 2018, and a further $500 on March 22, 2018. Combined with the initial $1,000 referred to in the jail calls, Person-1 sent McGruder a total of $2,500 from March 13, 2018, to March 22, 2018.

15.     On March 25, 2018, Pouncy again called Person-1 on a recorded jail line and asked Person-1, "*what was the verdict with the realtor?*" Person-1 said that McGruder hung up on him, but that "*I think he still go through with it though,*" and

6

"*he ain't gone turn down the money.*" The following day, Pouncy called Person-1 and said, "*I am lost on what the realtor want, man, but, um, my thing was that he was gonna give you the deed . . . once you give him 25 more hundred, then he was gonna give you the – sign the bitch over later and you give him the other 5.*" Based on the investigation, Pouncy was describing his intended scheme to pay McGruder another $2,500 before his testimony and a final $5,000 after his testimony. Combined with the $2,500 that was already paid, this would represent a total payment to McGruder of $10,000 for his testimony.

16.     I have also reviewed information retrieved from two contraband cellular phones seized by the Michigan Department of Corrections (MDOC) at Pouncy's Michigan state correctional institution. Phone 1 was seized on June 5, 2018, from a prisoner housed in the same facility as Pouncy. Phone 2 was seized on June 8, 2018, from among papers in Pouncy's prison cell. The data on Phone 1 and Phone 2 was extracted on April 23 and 24, 2019, and showed that Pouncy used both phones.

17.     Phone 1 contained communications beginning in April 2018 and continuing through the early morning hours of June 5, 2018. Information contained in Phone 1 was consistent with its usage by Pouncy during this time, including: (a) communications and documents with details of Pouncy's carjackings and

pending legal proceedings; (b) messages identifying the phone user as "Omar" or "Omar Rashad Pouncy"; (c) use of social media accounts associated with the name "Omar Pouncy" and of the email account "omarpouncy24@gmail.com"; (d) pictures that appear to be of Pouncy; and (e) communications with phone numbers of individuals known to be associated with Pouncy.

18.    Phone 2 also contained information consistent with its use by Pouncy during the period of June 6, 2018, to June 8, 2018 including: (a) messages identifying the user as "Omar"; (b) use of social media accounts associated with the name "Omar Pouncy" and of the email account "omarpouncy24@gmail.com"; and (c) communications with telephone numbers that were also associated with communications on Phone 1 and with communications on Pouncy's prison phone account.

19.    On April 2, 2018, Pouncy used Phone 1 to text Person-1 at the number XXX-XXX-7021, which was saved in Phone 1 under the name "Cuzo." In the message, Pouncy said, "*Cuz text me the realtor's # asap.*" Person-1 then texted Pouncy the number XXX-XXX-6674. A search of a database available to law enforcement showed that the phone number ending in 6674 was registered to "Jaawkawa McGruder."

8

20.    Pouncy then texted McGruder, stating, "*Hit me back asap $$$$.*" McGruder responded, "*Who is this*," to which Pouncy responded, "*Ur cuz n**** call me asap.*" McGruder asked, "*What's the deal*," and Pouncy responded, "*Cuz if I take care of my part do I have ur guarantee?*"

21.    On April 4, 2018, Pouncy texted McGruder, "*What's The Deal.*" McGruder responded "*Just come threw in time so U can Go over All the Paperwork only need to know what kind gun,  And Cars / Witch I see cars in some paper work.*" During the same conversation, Pouncy texted McGruder, "*The checks should be cleared 2morrow no later than Friday. We need 2 chop it up tho.*" After a few texts setting up a time for a phone call between Pouncy and McGruder, Pouncy concluded, "*I'll hit u @ 10 tomorrow. But if that cash clear lil cuz will PayPal u before then.*" McGruder then responded, "*No PayPal, shit take too long / Walmart to Walmart*," and Pouncy agreed, "*Alrite tell lil cuz.*"

22.    Records for Walmart-to-Walmart transactions show that on April 4, 2018, a payment of $2,500 was made by Person-1 to McGruder.

23.    On the morning of April 7, 2018, Pouncy texted McGruder, "*Alrite cuz. Dont let them know we're talkn / To each other*," and McGruder responded, "*I know.*" On April 7 and 8, 2018, there were multiple phone calls between Pouncy and McGruder. Then, on April 9, 2018, Pouncy texted McGruder, saying "*Cuz I talked*

*2 the lawyers they said 'you would make a great witness.'"* Based on statements by Pouncy's counsel at the May 22, 2018, hearing, Pouncy's counsel traveled to Arizona to meet McGruder in April 2018.

24.    Also on April 9, 2018, Pouncy discussed his case on a recorded jail call with a third party and his counsel's visit to McGruder. Pouncy explained, "*it all depends on this guy's level of prep, uh, preparedness, the witness, the level of preparedness, you know what I mean? 'Cause it's going to boil down to credibility. So he, his lawyer and my lawyer flew down there to meet with him to make sure he prepared to testify. 'Cause he can't just go in there and say, yeah it was me, and it wasn't Omar, you know what I mean? He gotta remember the details of what he did, and why he did it, and how he did it, and when he did it, you know what I mean? 'Cause that's what it boil down to – credibility. So that's what all my energy been to. . . .*"

25.    Records from Phone 1 also show additional phone calls and attempted phone calls between Pouncy and McGruder in April and May 2018.

26.    On May 13, 2018, around 2:30 p.m., nine days before Pouncy's hearing in federal district court, McGruder texted Pouncy, saying:

> *You too much of a Risk for me cuz Either have rest of money to me before I fly out,  Or I'm Not flying out.  You risk your own life and*

*them N****s around you for what? IDK but I'm not openly letting you play with mine.*

*and Talk to cuz He Said you got it when You saying he got it.*

*Cuz You know I will Flip the whole damn scrip, if I walk out that place and my shot ain't where it pose to be,*

*But To Get Rid of that Thought, Have It Sent On 19th no later and my Flight leave the 20th*

*No 19th, no 20th.*

Based on the investigation, McGruder was demanding up-front payment of the rest of the money promised to him by Pouncy, before he flew to Michigan; otherwise, McGruder would not come to Michigan.

27.    Pouncy then sent a message to Person-2 at telephone number XXX-XXX-4556. MDOC records show that Person-2 registered an account with MDOC's JPay electronic messaging system using the phone number XXX-XXX-4556.

28.    Pouncy's message to Person-2 stated, "*Cuz holla at this n**** jaak he just got on sum bullshit*", and contained screenshots of McGruder's text messages to Pouncy. Pouncy also called Person-2 after sending the message. Based on the investigation, "jaak" is a nickname for Jaakawa McGruder.

29.    Person-2 responded to Pouncy, saying "*Send me his number*." Pouncy stated, "*That n**** got me hot i done gave this n**** 5k and he tryn 2 renege.*"

Pouncy then texted Person-2 the number for McGruder at XXX-XXX-6674. Pouncy also called Person-2 two more times.

30.    Separately, Pouncy also texted Person-3 at XXX-XXX-5284. Based on MDOC's review of records from the GTL phone system, this number was registered to Person-3. In the text, Pouncy asked Person-3, "*Bestie do u have that money in the safe or the bank*." Person-3 replied, "*Smdh in the bank and you can't trust to give him the whole thang as much as he flip flop what's gone make him come through after that ?*" to which Pouncy replied, "*Screen shot ur account balance so I can show him we got the money*." In context, Person-3's response to Pouncy's text indicated that she was holding the payment for McGruder in a bank account, and she was advising Pouncy that he could not trust McGruder to follow through with the scheme if Pouncy paid McGruder the full amount in advance.

31.    At around 3:16 p.m., Pouncy sent a response text message to McGruder, stating:

> *If u reneging just give me that 5k i already gave u. N\*\*\*\* u playn it foul. U doing wat u do aint got shit 2 wit wat I'm doing i aint give u 5k for no reason. We need 2 stick 2 the plan lil cuz going t showu the $ the day of court and smash it on u rite wen u get off the stand. N\*\*\*\* I'm not giving up no 10k for nothing. . . . We doing business i aint gettn extorted. At the end of the day I'm coming home regardless I'm just tryn 2 set this shit up 4 my lawsuit. But if u reneging just let me know so i can email my attorneys asap so i can get a closer date and so they won't have 2 pay for that flight.*

32.    Pouncy attempted to call McGruder and then sent additional texts to

him, stating:

> *"I'll have the money given 2 u at the court house I'm not comin off*
> *no more money b4 then"*
>
> *"Or I'll have it sent to a lawyer down there with the agreement dat*
> *they dont turn it over til i confirm u testified*
>
> *And I gave u that 5k as a down payment 4 testifying u talkn 2 my*
> *lawyers aint goin 2 get me home t-ahk testifying 4 free. I'll give the*
> *$ 2 him 2 give t u or 2 auntie angel"*

33.    After trying again to call McGruder, Pouncy texted to McGruder:

> "*Now u dont want 2 answer just send me my 5k back asap. I hope*
> *we dont fall out over u gettn on no hoe shit. Business is handle with*
> *n\*\*\*\*s stickn 2 the plan i can kill myself 2day n\*\*\*\* u still obligated*
> *2 stick 2 the plan I KNEW U WAS GOING 2 GET ON SUM*
> *THIRSTY SHIT LIKE THIS.*"

34.    Based on the investigation, Pouncy was suggesting various ways to

reassure McGruder that he would be given the remaining $5,000 payment after his

testimony. Pouncy further explained that he had given McGruder the first $5,000 as

a down payment for testifying in court, that he wasn't giving McGruder $10,000 for

nothing, and that McGruder should return the $5,000 down payment if McGruder

was not going to testify.

13

35.    Around 3:29 p.m., Person-2 sent Pouncy a message, suggesting that Pouncy, "*Just give me the rest I'm gonna hold it into it's over*." In context, "the rest" was a reference to the remaining $5,000 payment for McGruder.

36.    Approximately half an hour later, Person-2 sent Pouncy screen shots of Person-2's communications with McGruder, who was identified as "Yaak McGruder," on Facebook Messenger. In these messages, Person-2 disparaged McGruder for his conduct, and McGruder responded,

> "*He Must Have Messaged you, So That Mean All this Shit Off Cuz He Don't Got My Mufuckin Money,*
>
> *Like O Told His Bitch Ass If I did the Shot And Got Caught, N\*\*\*\*\*\*\* I'd Seat My Ass Down Humbled, Not Trying To Even Put My Family In that Shit.*"

Person-2 responded,

> "*Tht N\*\*\*\* is gonna pay you he worried about you doing what you say you gonna do he gonna give the money to me I'll hold it and soon ass you leave out tht mf I'll be right there with yo money and you go back to living yo life.*"
>
> "*Bro you think I'll let tht N\*\*\*\* play you.*"

In context, McGruder was complaining that Pouncy should accept the consequences of having done the carjackings, rather than putting others at risk. Person-2 was attempting to convince McGruder to follow through with the scheme by assuring McGruder that Pouncy would give Person-2 the money, that Person-2 would then

14

give it to McGruder after McGruder left the courthouse, and that Person-2 would not let Pouncy cheat McGruder.

37.   Around 4:02 p.m., Pouncy texted Person-2 that McGruder was going to go forward with the scheme, stating, "*He say he was just playn and he going 2 do it so good look cuz this n\*\*\*\* play 2 fuckn much*." Person-2 responded, "*I got you just dnt play him cuz*." Pouncy responded, "*Cuz on my granny I'm not that shot aint shit i already gave him 5k*."

38.   That evening, Pouncy sent Person-3 a screen shot of a Facebook Messenger exchange between Pouncy and McGruder. In that exchange, Pouncy stated, "*Alriye2 n\*\*\*\* we nine days away they got 3 give me $50,000.00 for each year so that's $650,000 not including the lawsuit money. They just passed the 'WRONGFUL IMPRISONMENT COMPENSATION ACT IN MICHIGAN' google it and read it. U know I'm going 2 break* [bread emoji]." In context, Pouncy was describing his intention to sue the State of Michigan for wrongful imprisonment based on McGruder's expected testimony.

39.   On May 15, 2018, McGruder called Pouncy in a call lasting approximately 5 minutes.

40.   On May 20, 2018, at 12:59am, McGruder texted Pouncy the address of the Holiday Inn at 5353 Gateway Centre, Flint, MI. According to the transcript of

15

the May 22, 2018, hearing, McGruder stayed at the Holiday Inn hotel after flying to Michigan from Arizona for the evidentiary hearing.

41.     Ten minutes later, Pouncy sent the same address to Person-3. A few hours later, Pouncy called Person-3, and then Person-3 texted Pouncy, "*Do I suppose to be taking him any or just showing him ?*" Based on the context, it is probable that Person-3 was asking Pouncy whether she should give McGruder any of the remaining payment at that time, or if she should just show McGruder the money. Person-3 and Pouncy also had several additional calls on May 20-21, 2018.

42.     According to the transcript of the May 22, 2018, hearing, Pouncy's counsel met again with McGruder at the Holiday Inn on May 21, 2018. During that day, McGruder texted Pouncy on numerous occasions. In one instance, McGruder stated that Pouncy's attorneys were giving him a break to go back over things, and added, "*We need to talk about all this Shit set by set on what happen, shit they asking I don't know.*" In context, McGruder was stating that he needed to talk to Pouncy about the details of the carjackings, because Pouncy's attorneys were asking McGruder about aspects of the crimes that he did not know. Pouncy then called or attempted to call McGruder multiple times during the rest of the day on May 21, 2018.

43.     At around 6:16 a.m. on May 22, 2018, the morning of the evidentiary hearing, McGruder texted Pouncy to say that he had not received a call from Pouncy. Pouncy stated that "*It was going straight 2 voicemail I had like 3 ppl call u guess phone was dead*." McGruder responded, "*Yes call me like 8am refresh of everything*."

44.     Approximately 10 minutes later, McGruder texted Pouncy, " [Person-3]*gone be here on time right*," to which Pouncy replied, "*Yes she got u*." McGruder said, "*I hope so I got more shit to clear up here / I could get arrested,  I need money asap*." Pouncy replied, "*The Attorney General's office GUARANTEED the Federal judge that they will NOT arrest u. So* [Person-3] *will b their and have the $ ass soon as u get done testifying. Cuz we sticking 2 da stricpt or wat*." In context, McGruder was asking if Person-3 would be coming on time, and he again expressed his concern about receiving the money for his testimony. Pouncy confirmed that Person-3 would give the money to McGruder as soon as he was done testifying, and also sought reassurance that McGruder would stick with the scheme to commit perjury.

45.     Starting around 6:55 a.m. on May 22, 2018, Pouncy sent McGruder three text messages detailing the carjackings. These messages stated as follows:

> (6:55 a.m.) *Yeah the 1st carjacking happened in Burton it involved the Green older Monte Carlo. You test drove tge car two different times with 2 different guys and the 2nd time u carjacked him at gun*

point. They only saw u but Wayne and Tahk was in the car waitn on u

(7:18 a.m.) *The 2nd one involved the goldish Camaro. Y'all were out riding You Wayne and Tahk on Richfield rd and saw a souped up race Camaro 4 sale outside of a racecar fabrication shop u got out that nite and approached the place of business where it was setup 4 sale at and u realized that it was sum1 u knew from being at the race tracks with Sam Wood. The guys name was Joseph Scott and he said u looked familiar 2 him that's when u told him ur name was Jacob Wood Sam Wood's lil brother. From there he told u that u could come back the next day to test drive the car and have ur mechanic look at it. Y'all u wayne and Tahk left came back the next day and two more guys were there along with Scott Davis the guy u know from the race track. Yall left, stopped at a gas station on carpenter and dort hwy then yall headed over to Keller Rd at the deadend. It were sum ppl outside next door working on the house. Yall got out the car wayne pulled the gun out told the ppl (it was only 2 of them Scott davis did NOT cum with yall) to give him the keys and the title the two ppl refused Wayne shot the gun by surprise it was so close to u ur ears rang and then he forced them into the woods. You hopped in the truck and Wayne and Tahk left in Wayne's car.*

(7:34 a.m.) *The 3rd one involved the White Cadillac and Red Corvete. Y'all seen a car advertised 4sell in the newspaper y'all called 2 schedule a test drive. The owners said come the next day. The next day you called them back to set up the test drive. Y'all drove all the way to Fenton to the ppls house. Yall got lost several times so you kept calling them back 4 directions. Yall finally arrived. You got out met the husband and wife u got in the car with the husband. You were in the driver seat. The husband was in the passenger seat. Wayne and Tahk stayed in Wayne's car. The wife got into a red corvette. Yall traveled to Mr. Morris. Y'all stopped at a gas station on the corner of Clio and Coldwater then yall headed 2 the same deadend road at the last house on the right. This time someone was home, 2 ensure that u would not alarm them inside the home u went*

18

*up 2 the door and 1st one black male came to the door. U asked to mow the lawn, he said wait so he could get the owner then another older black male came 2 the door u asked him if u could cut the grass. He declined ur offer. You left went back out to the car pulled the gun out told the white male to get out the car and to give u the title. You walked hom to the road where his wife was told hee to get out the car. She got out you tooj the keys and told them to get in the woods. They walked in the woods. Wayne got out of his car jumped in the corvette and sped off Tahk left in Wayne's car and u jumped back in the Cadillac and left.*

Based on the investigation, these facts corresponded to the three carjackings for which Pouncy had been convicted. "Wayne" was a reference to Wayne Grimes, and "Tahk" was a reference to Tiakawa Pierce.

46.    After receiving these messages, McGruder texted, "*OK so I was driving the white car,*" and Pouncy responded, "*Cadillac yes.*" McGruder continued, "*The Truck with gold car and motty / Monty.*" McGruder then texted Pouncy, "*Call me asap.*"

47.    During the morning before the hearing, Pouncy called or tried calling McGruder approximately six times, and also called or tried calling Person-3 several times. Pouncy also sent the same three text messages detailing his carjackings to Person-3.

48.    After the hearing, Pouncy attempted to call McGruder numerous times on May 22, 2018, and May 23, 2018. At approximately 4:00 a.m. on May 23, 2018,

Pouncy and McGruder had a phone call that lasted approximately seven minutes. No further calls or messages between Pouncy and McGruder were located on either contraband phone.

49.     On May 29, 2018, the State of Michigan filed a copy of the transcript of Pierce's February 14, 2008, plea hearing, during which Pierce had testified under oath that Pierce, Pouncy, and Grimes committed the carjacking that occurred on October 11, 2005. That same day, Pierce texted Pouncy his email address and Pouncy sent an email from omarpouncy24@gmail.com to Pierce, saying, "*Cuz they just gave us this and tryn 2 use it against me we got tp clean this up. My name all thru this shit.*" The email included an attachment with the title "Tiakawa Transcript.pdf." Pierce asked how the state could use the transcript against Pouncy, and Pouncy explained, "*It was at ur plea and u r implementing* [implicating] *me so that's how they using it. U were under oath.*" After additional discussion, Pouncy said to Pierce, "*Lawyers don't know nothing bout a play / Just tell then straight up I had nothing 2 do with it.*"

50.     The next day, on May 30, 2018, Pouncy sent an email from omarpouncy24@gmail.com to Person-1. The email was written in the first person, addressed to one of Pouncy's attorneys, and signed with Person-1's name. In the email, Pouncy had Person-1 deny that McGruder asked for money for his testimony

or that Pouncy offered McGruder money for testimony. Pouncy also had Person-1 state that Person-1 asked Pouncy for $20,000, pretending it was a demand from McGruder, when in reality Person-1 intended to keep the money for himself. Based on the investigation, it appears that Pouncy drafted the email to try to deflect blame from Pouncy to Person-1 for elements of the scheme.

51.    On May 31, 2019, the State of Michigan submitted a motion to dismiss Pouncy's federal habeas proceedings with prejudice on the grounds that evidence from Phone 1 and Phone 2, in conjunction with other evidence, showed that Pouncy had suborned perjury during the habeas proceedings.

52.    On July 27, 2019, Pouncy called Person-3 on a recorded jail line. Pouncy instructed Person-3 that everyone only thought it was Pouncy that had been contacting them with respect to Pouncy's hearing, but it was actually someone else impersonating Pouncy, and that was why they had acted the way they had regarding the hearing. Pouncy instructed Person-3 that this impersonator was the reason why they wanted Pouncy to give McGruder money, "*so that is why I got y'all explaining that, that y'all thought it was me, and it wasn't you know.*" Pouncy stated that he would prove that he wasn't the one sending the text messages, because Pouncy allegedly "[couldn't] *get a cellphone signal in that cell.*"  Pouncy further instructed Person-3 that "*the only reason why y'all gave him the money was because you knew*

*he had already confessed and he said that he wanted it for a lawyer.*" He then added,
"*You know, but he gave it back to you at the court date, you know. He gave it back to you at the court date, so that goes to prove that it wasn't for his testimony. It was for his lawyer in the case that he got locked up.*" Based on the investigation, this was an attempt by Pouncy to have Person-3 continue to further the conspiracy by deflecting blame from Pouncy for McGruder's perjury.

## CONCLUSION

53.    Based on the foregoing, there is probable cause to believe that violations of 18 U.S.C. § 1512(k) (conspiracy to tamper with a witness) have been committed by Pouncy, McGruder, and others, known and unknown, in the Eastern District of Michigan and elsewhere.

Joseph Vandenbossche
Special Agent

Sworn to before me and signed in my presence and/or by reliable electronic means on _____December 19, 2022.

Hon. Curtis Ivy, Jr.
United States Magistrate Judge